## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

      **Plaintiff,**

    **v.**                                    **CRIMINAL NO. 1:03CR50**
                                        **(Judge Keeley)**


MICHAEL J. KELLY, SR.,

      **Defendant.**

## MEMORANDUM OPINION AND ORDER GRANTING-IN-PART
## AND DENYING-IN-PART DEFENDANT'S POST TRIAL MOTIONS

On July 2, 2004, following a two week trial, a jury convicted the defendant, Michael J. Kelly, Sr. ("Kelly"), on Counts 95, 96, 97, 98, 99, and 205 of a 206 count indictment. On August 9, 2004, Kelly moved the Court for a judgment of acquittal as to Counts 97-99 and 205, and for a new trial as to Counts 95-96. Kelly alternatively moved for a new trial as to Counts 97 and 205 if the Court did not acquit him on those counts. Those motions are pending before the Court. Also pending is Kelly's motion for reconsideration of the Court's earlier order denying his motion for attorneys' fees and expenses. These matters have been fully briefed and argued, and for the following reasons, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the defendant's motions.

### I.  SUPPRESSION ISSUES REGARDING COUNTS 98-99 AND 205

On July 24, 2002, law enforcement officers executed a search warrant upon the premises of the defendant. Pursuant to the

warrant, the officers seized several firearms and receivers.[1]
Kelly contests the seizure (and subsequent admission at trial) of
four of these firearms, which were not enumerated in the warrant.
The firearms at issue are an IMI, Uzi, 9mm caliber (Count 98); a
Russian AK-47, 7.62x39mm caliber (Count 99); a Maadi Model RMLS,
7.62x39mm caliber (Count 205); and a Federal Arms Corporation,
Model FAL, .308 caliber (Count 205). The Government maintains that
the seizure of these challenged firearms was proper under the plain
view doctrine.

> Three predicate showings are required in order to
> justify a warrantless seizure under the plain view
> doctrine. First, "the seizing officer [must] be lawfully
> present at the place from which the evidence can be
> plainly viewed. Second, the officer must have a lawful
> right of access to the object itself. And [third], the
> object's incriminating character must . . . be
> immediately apparent."

United States v. Wells, 98 F.3d 808, 809-810 (4th Cir. 1996)
(quoting United States v. Legg, 18 F.3d 240, 242 (4th Cir. 1994)).
"If, however, the police lack probable cause to believe that an
object in plain view is contraband without conducting some further
search of the object . . . the plain view doctrine cannot justify

---

[1]  The receiver is "[t]he basic unit of a firearm which houses
the firing and breech mechanism and to which the barrel and stock are
assembled." United States v. Spinner, 152 F.3d 950, 957 (D.C. Cir.
1998). The frame or receiver alone is not classified as merely a part
of the weapon; it is the weapon. United States v. Williams, 364 F.3d
556, 559 (4th Cir. 2004).

its seizure." <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 374 (1993) (citing <u>Arizona v. Hicks</u>, 480 U.S. 321 (1987)).

Kelly argues that the Government failed to establish that the officers who seized the disputed firearms had a "lawful right of access" to the firearms, or that the "incriminating character" of each of the firearms was "immediately apparent."

### A.    *Officers' Right of Access*

In <u>Wells</u>, the Fourth Circuit held that seizing agents had a lawful right of access to challenged evidence because they "were lawfully searching [the defendant's] apartment pursuant to a warrant, and the [evidence] was located in plain view in a place where items that were described in the warrant reasonably could have been found." <u>Id.</u> at 810 (citing <u>Maryland v. Garrison</u>, 480 U.S. 79, 84 (1987)). This case presents analogous circumstances. Pursuant to a warrant, the officers were searching Kelly's premises for MKS M-14 or M-14A1 receivers and firearms, among many other items, when they encountered the challenged firearms. Although he did not observe where the agents found the challenged firearms, Officer Richard Vasquez, the ATF's on-site firearms expert, testified that the firearms were discovered on Kelly's premises, purportedly in a closet.

Based on the scope of the warrant, the challenged firearms could reasonably be found in any location where MKS M-14 or M-14A1

receivers and firearms could be stored.  Thus, considering the small size of the receivers, the search could lead agents to virtually anyplace on Kelly's property.  There is no evidence that suggests the seizing agents exceeded the scope of their search when they discovered the challenged firearms.  Therefore, the Court concludes that, under the totality of the circumstances, the seizing agents had a lawful right of access to the challenged firearms.

**B.   *Incriminating Character of the Firearms***

The Court must next consider whether the incriminating character of the challenged firearms was immediately apparent without any further search.  In Wells, the defendant also sought to suppress a firearm seized from his apartment under the plain view doctrine.  The Fourth Circuit ruled that "evidence from the prior criminal records review indicating that Wells had a previous felony conviction was sufficient to provide probable cause to believe that the firearm constituted evidence of [unlawful possession of a firearm by a convicted felon]."  Id. at 810 (citations omitted). The Wells court further held that the seizing agent need not have personal knowledge of the basis for probable cause so long as the agents "collectively had probable cause to believe the weapon was evidence of a crime at the time of the seizure."  Id. (citations omitted).  Therefore, to determine whether the challenged firearm's

-4-

incriminating character was readily apparent, the Court must focus on the existence of probable cause at the time of seizure.

Generally, probable cause exists if "the totality of circumstances is sufficient to warrant a reasonable person to believe" that an item is contraband. <u>United States v. Humphries</u>, 372 F.3d 653, 659 (4th Cir. 2004). "'The principal components of a determination of . . . probable cause will be the events which occurred leading up to the . . . search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to . . . probable cause.'" <u>United States v. Brookins</u>, 345 F.3d 231, 235-36 (4th Cir. 2003) (quoting <u>Ornelas v. United States</u>, 517 U.S. 690, 696 (1996)).

### 1.  The Impact of the Seizing Officers' Knowledge

During the execution of their search of Kelly's residence, ATF officers encountered numerous firearms that were not listed in the search warrant.  The officers inspected these firearms and delivered some of them to Officer Vasquez, who evaluated their legality and thus determined which firearms to seize. Specifically, he concluded that the Uzi and the AK-47 were illegal machineguns and that the Maadi and FAL were illegal semi-automatic assault weapons.  Neither he nor the seizing agents, however, knew whether the Uzi and the AK-47 were registered in National Firearms

Registration and Transfer Record ("NFRTR") and, thus, lawfully possessed. 26 U.S.C. § 5681(d) (2000). Moreover, they did not know whether Kelly possessed the Maadi and FAL before September 13, 1994, a fact which would have rendered his possession of those weapons to be lawful at the time of seizure. 18 U.S.C. § 922(v)(2) (2000).

Based on the officers' ignorance of these facts, Kelly maintains that the initial seizure of the Uzi, AK-47, Maadi and FAL was unlawful because the "incriminating character" of those firearms could not have been "immediately apparent" without such information. Kelly also asserts that the initial delivery of those firearms to Vasquez on-site was an unlawful seizure because the searching officers did not have the requisite knowledge to discern the legality of the firearms.

The Government presented no evidence establishing the knowledge of the officers who first observed the disputed firearms and presented them to Vasquez.[2] Under <u>Wells</u>, however, the Court must evaluate the factual predicate for probable cause on a collective basis. 98 F.3d at 810. Therefore, the initial delivery

---

[2] The affidavit to the search warrant indicates that no regulated firearms were registered in the name of Kelly or his wife; however, there is no evidence suggesting that Vasquez and the other officers on-site were aware of this fact. Thus, despite the Government's urging to the contrary, the Court cannot impute this knowledge to Vasquez in evaluating whether he had probable cause to seize the challenged firearms.

of the firearms to Vasquez was permissible, provided that Vasquez had probable cause to believe that the firearms were illegal. Id.; see also United States v. Rose, 695 F.2d 1356, 1358 (10th Cir. 1982) (refusing to invalidate seizure of firearm barrels, where seizing officers could not positively identify the barrels but "immediately ask[ed] federal weapons experts accompanying the local officers to examine the barrel ends").

According to Kelly, knowledge of the disputed firearm's registration and prior possession history is a necessary prerequisite to establishing probable cause to seize the challenged firearms. In support of this position, he relies on a line of cases that are factually distinguishable from the circumstances of the search conducted in this case. See United States v. Grant, 476 F. Supp. 400 (D. Fl. 1979) (invalidating seizure of machinegun because officers had no basis to believe possession was illegal); United States v. Dart, 747 F.2d 263 (4th Cir. 1984) (invalidating plain view seizure of weapons following warrantless entry into storage building; initial discovery of weapons was outside the scope of lawful warrantless search); United States v. Savides, 664 F. Supp. 1544 (N.D. Ill. 1987) (suppressing plain view seizure of firearms where the search warrant did not specify the seizure of firearms and the Government presented no other independent basis for seizure).

## MEMORANDUM OPINION & ORDER

In <u>United States v. Naugle</u>, 997 F.2d 819 (10th Cir.), <u>cert. denied</u>, 510 U.S. 997 (1993), by contrast, the Tenth Circuit upheld a seizure under circumstances substantially similar to those under review here.    In <u>Naugle</u>, a county sheriff's department obtained a search warrant on the defendant's home to search for documents, records, and surveillance equipment.    <u>Id.</u> at 821.    During the execution of the search, an officer discovered and seized a sawed-off shotgun that he found in a closet.    The officers later determined that the shotgun was unregistered and thus illegally possessed.    In evaluating the propriety of the seizure, the Tenth Circuit offered the following analysis:

> The officer testified that it was immediately apparent to
> him that the barrel of the shotgun was less than 18
> inches long, and was therefore likely illegal. However,
> because of the structure of federal firearms laws,
> possession of a sawed-off shotgun is not per se illegal;
> it is only illegal to possess an <u>unregistered</u> sawed-off
> shotgun. 26 U.S.C. § 5861(d). . . .    Of course, no
> officer can tell upon first sight whether a weapon is
> properly registered, but probable cause "merely requires
> that the facts available to the officer would warrant a
> man of reasonable caution in the belief that certain
> items may be contraband or stolen property or useful as
> evidence of a crime; it does not demand any showing that
> such a belief be correct or more likely true than false."
> <u>Texas v. Brown</u>, 460 U.S. 730, 742 (1983) (plurality
> opinion).    Although sawed-off shotguns may be legally
> possessed, that is the rare case, and we hold that the
> officer had probable cause to seize the weapon and
> determine its registration status based on his
> observation of its barrel.

997 F.2d at 823 (emphasis in original).

### MEMORANDUM OPINION & ORDER

The reasoning in <u>Naugle</u> applies with equal, if not greater, force to the challenged seizure here. The firearms at issue are either machineguns or semiautomatic assault weapons, and purportedly illegal firearms (i.e., M-14 and M-14A1 receivers) were a primary object of the search warrant. Based on his substantial experience in classifying firearms, Officer Vasquez identified the Uzi and the AK-47 as machineguns and the Maadi and FAL as semi-automatic assault weapons, and concluded that all four firearms were unlawfully possessed. Therefore, under the totality of the circumstances, the Court finds that the officers collectively possessed probable cause to seize those firearms without first determining whether they were registered or possessed before September 13, 1994.

### 2.   The Secondary Search of the Uzi

With respect to the Uzi receiver, Kelly also argues that Vasquez could not discern the incriminating character of that firearm without removing the top cover, which, he contends, constituted an unauthorized "search."

At the June 21, 2004 suppression hearing in this matter, Officer Vasquez testified that, when he first observed the Uzi receiver, he noticed a "color change" where the block is supposed to be. (Vasquez Suppression Hr'g Tr. at 18.) This discovery prompted him to open the top cover of the receiver, at which point

he found that the block had been removed (Id. at 8.) The absence of the block allowed installation of a machinegun bolt; therefore, Vasquez determined that the Uzi receiver was a machinegun receiver. (Id.) Weighing the totality of the circumstances, the Court concludes that Vasquez's secondary search of the Uzi receiver was justified by probable cause.

## II. PROPRIETY OF ADMITTING EXPERT TESTIMONY ABOUT AK-47 (COUNT 99)

At trial, the jury necessarily concluded that the AK-47 rifle in Count 99 was a "machinegun" because it could be "readily restored" to shoot automatically. 26 U.S.C. § 5845(b). To prove that the rifle could be readily restored, the Government proffered the testimony of Officer Vasquez. Based on his background as an ATF firearms enforcement officer with the Firearms Technical Branch, Vasquez testified that the welded sear pin could be drilled out and replaced with a removable sear pin onto which could be mounted an automatic sear. With an automatic sear mounted on the sear pin, Vasquez opined that the rifle would shoot automatically more than one shot, without manual reloading, by a single function of the trigger.

Kelly argues that Vasquez's opinion as to the AK-47 was inadmissible because it was based upon his "general background" and "unspecified literature on the AK-47." Kelly also asserts that, to be admissible, such opinions must be supported by test data or

relevant literature in the field.   See Oglesby v. General Motors

Corp., 190 F.3d 244, 249 (4th Cir. 1999).

Under Rule 702 of the Federal Rules of Evidence,

> a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto
> in the form of an opinion or otherwise, if (1) the
> testimony is based upon sufficient facts or data, (2) the
> testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles
> and methods reliably to the facts of the case.

To determine the admissibility of expert testimony, the Court must

evaluate both its relevance and reliability.   United States v.

Crisp, 324 F.3d 261, 265 (4th Cir.), cert denied, 124 S. Ct. 220

(2003) (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579,

589 (1993)).  In Daubert, the Supreme Court enumerated five factors

that "may be used in assessing the relevancy and reliability of

expert testimony:"

> (1) whether the particular scientific theory "can be (and
> has been) tested"; (2) whether the theory "has been
> subjected to peer review and publication"; (3) the "known
> or potential rate of error"; (4) the "existence and
> maintenance of standards controlling the technique's
> operation"; and (5) whether the technique has achieved
> "general acceptance" in the relevant scientific or expert
> community.

Crisp, 324 F.3d at 265-66 (quotation omitted).   This list of

factors, however, is neither definitive nor exhaustive.   Id.

(citing Daubert, 509 U.S. at 593-94) "As Daubert emphasized, the

analysis must be 'a flexible one.'"   Id. (citations omitted).

In this case, Officer Vasquez testified extensively concerning his experience, skill, knowledge and training in the area of firearms. He specifically indicated that he has assembled and disassembled numerous AK-47s. He also has developed a course on the AK-47 that is taught to federal, state, and local law enforcement officials. Moreover, he teaches firearms identification and machinegun conversion courses.

Significantly, although called upon to opine on whether Kelly's AK-47 was "readily restorable" to automatic fire, Vasquez admitted that he has no hands-on training or experience with converting semi-automatic AK-47s into fully automatic versions. Indeed, he has never converted a semi-automatic AK-47, and the extent of his knowledge of such conversions is derived entirely from unspecified videos, books and handouts sold on the Internet.[3]

Although Vasquez has performed evaluations of restored AK-47s as an ATF agent, he has only examined exemplar firearms converted by other agents. Whenever he has done this, he has, first, visually compared the converted exemplar to a videotape recording of the conversion and submitted instructions, and then fired the exemplar to determine whether it shoots automatically. Otherwise,

---

[3] Vasquez testified that the Internet materials teach the "common hobbyist" how to convert semi-automatic AK-47 receivers into machineguns.

he has never personally confirmed whether the conversion process has been done properly or, of great relevance to this case, how long the conversion may have taken.

Other than his personal observations, Vasquez could not indicate whether any objective standards applied to the conversion of AK-47s, whether the conversion methodologies have been tested, or whether such methodologies have a known or potential rate of error. Indeed, in retrospect, it is clear that Vasquez offered no objective basis for the Court to evaluate the reliability of his testimony concerning the conversion of the challenged AK-47.

In light of Vasquez's notable lack of hands-on training and experience in the conversion of AK-47s, the Court concludes that it erred when it permitted him to offer expert testimony regarding whether the AK-47 was "readily restorable to fire automatically" and because expert testimony was necessary for the jury to determine that issue, without Vasquez's testimony the Government's evidence at trial was insufficient to convict, thus warranting Kelly's acquittal on Count 99. The Court, therefore, **GRANTS** the defendant's motion for judgment of acquittal as to that count.

### III. WHETHER THE GOVERNMENT PROVED THE KNOWLEDGE ELEMENT OF COUNTS 98 AND 99

Kelly challenges the sufficiency of the Government's evidence regarding his knowledge of whether the Uzi receiver (Count 98) and the AK-47 (Count 99) were "machineguns."

> A defendant challenging the sufficiency of the evidence to support his conviction bears "a heavy burden." United States v. Hoyte, 51 F.3d 1239, 1245 (4th Cir. 1995). In reviewing the sufficiency of the evidence supporting a criminal conviction, our role is limited to considering whether "there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942). We must bear in mind that "the jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented." United States v. Murphy, 35 F.3d 143, 148 (4th Cir. 1994). Further, "if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." Id. Reversal for insufficient evidence is reserved for the rare case "where the prosecution's failure is clear." Burks v. United States, 437 U.S. 1, 17 (1978). In sum, we "may not overturn a substantially supported verdict merely because [we] find[] the verdict unpalatable or determine[] that another, reasonable verdict would be preferable." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

United States v. Beidler, 110 F.3d 1064, 1067 (4th Cir. 1997).

Counts 98 and 99 charge Kelly with knowingly and unlawfully possessing an unregistered Uzi and an unregistered Russian AK-47. The jury instructions defined "knowingly" as "voluntarily and intentionally and not because of ignorance, mistake or accident." "[K]nowledge can be inferred from circumstantial evidence, including any external indications signaling the nature of the

-14-

weapon." <u>Staples v. United States</u>, 511 U.S. 600, 615 n.11 (1994).
"[C]ircumstantial evidence is treated no differently than direct
evidence, and may be sufficient to support a guilty verdict even
though it does not exclude every reasonable hypothesis consistent
with innocence." <u>United States v. Jackson</u>, 863 F.2d 1168, 1173
(4th Cir. 1989).

### A.     *Knowledge That Uzi Receiver Was A Machinegun*

As to his knowledge that the Uzi receiver was a machinegun,
Kelly asserts that the only evidence presented was his previous
experience as a licensed federal firearms manufacturer and the fact
that he kept two semi-automatic Uzi receivers in his business
inventory in 1998.   The Government emphasizes, however, that
Vasquez testified to the ease of identifying the Uzi as a
machinegun.  Moreover, Kelly had extensive experience and knowledge
of firearms and their construction.    Evidence at trial also
established that the Uzi receiver was excluded from his personal
firearms collection inventory and his bound book, facts suggesting
consciousness of guilt.  When this evidence is viewed in a light
most favorable to the Government, the Court finds that there was a
substantial evidentiary basis for the jury's finding that Kelly
knowingly and unlawfully possessed an unregistered Uzi.

**MEMORANDUM OPINION & ORDER**

### B.   *Knowledge of Restorability of AK-47*

Kelly argues that the only evidence presented regarding his knowledge about the restorability of the AK-47 was his federal firearms manufacturers license.  The Government, on the other hand, stresses Kelly's expertise in assembling and manufacturing machineguns.   The Government also relies heavily on Vasquez's testimony about AK-47 conversions, which, as previously indicated, was erroneously admitted as expert testimony.   At trial, the Government otherwise failed to offer any specific evidence demonstrating Kelly's familiarity with AK-47s.   Thus, even when viewed in a light most favorable to the Government, the evidence on this issue did not substantially establish Kelly's knowledge of the restorability of the AK-47.

### IV.  PROPRIETY OF ADMITTING THE "ITEMS" FORMING THE BASIS OF COUNT 97

The evidence forming the basis of Count 97 consisted of five exhibits that the Government claimed were "firearms" within the meaning of 18 U.S.C. § 921(a)(3).  Specifically, the exhibits (nos. 102, 103, 104, 106, 107) were forward and rear M-14 receiver sections that had been "rough welded" together, i.e., there was a large weld bead around the middle of the purported receiver.  These exhibits were identified as M-14 receivers that the defendant shipped to James Frisbee.

**MEMORANDUM OPINION & ORDER**

Officer Vasquez testified that he could use a hand grinder to grind out the weld bead metal and install parts, which would permit the items to expel a projectile by the action of an explosive. <u>See id.</u> § 921(a)(3). He admitted, however, that he had not attempted to do so and was not aware of any one else who had ever done so. As such, Kelly claims that Vasquez's testimony concerning the "convertability" of the challenged exhibits was not admissible because it was not supported by "test data or relevant literature in the field."

Properly understood, Kelly's argument as to this issue contests the admissibility of expert testimony offered by Vasquez about certain exhibits, not the admissibility of the exhibits themselves. Vasquez testified that he had extensive experience with M-14s in the military, private, and public sectors. He has trained others to repair and shoot the M-14, and, as a gunsmith, he has built and sold match-grade M-14s for competitive shooters. Throughout his career, he has worked on "thousands" of M-14s. He has also classified numerous M-14s to determine their legality during the course of his work for the ATF. Moreover, Vasquez testified about his significant experience and training in welding and machining.

Kelly essentially asserts that Vasquez did not offer reliable expert testimony with respect to whether the challenged exhibits could be "readily converted" to M-14 receivers. However, at trial,

his attorney expressly acknowledged Vasquez's qualification to offer an expert opinion on related matters:

> MR. GARDINER: . . . With regard to . . . modification of firearms[,] [a]s long as those modifications related to welding, machining, things like that, I think he probably is qualified to testify about that.
>     And with regard to the welding together of--the readily restorable issue, I believe he's--it sounds like he's qualified also to talk about that.
> . . . .
> THE COURT:   With regard to the M-14's, there's no objection?
>
> MR. GARDINER: Well, with regard to the readily restorable issue there's no objection.

Kelly, therefore, recognized Vasqez's expertise in welding and machining M-14s, specifically with respect to restoring M-14s to automatic fire.   Similarly, the depth and breadth of Vasquez's knowledge, skill, experience and training with M-14s convincingly establishes the reliability of his opinion on the "convertability" of the challenged exhibits.   Thus, the Court concludes that Officer Vasquez's expert testimony with respect to the items forming the basis of Count 97 was properly admitted.

### V.   WHETHER THE GOVERNMENT PROVED THAT KELLY KNEW THE ITEMS IN COUNT 97 WERE FIREARM RECEIVERS

Kelly also asserts that the Government failed to produce sufficient evidence demonstrating that he knew the "items" forming the basis of Count 97 were firearm receivers.   The Court disagrees. Through Officer Vasquez's expert testimony, the Government elicited

substantial evidence supporting the jury's finding that those items were receivers.  Considering this evidence in light of Kelly's familiarity with M-14 receivers and his extensive knowledge of firearms, the jury could reasonably infer that he knew the disputed items were receivers. <u>Staples</u>, 511 U.S. at 615 n.11.  Thus, when viewed in the light most favorable to the Government, the Court finds that substantial evidence supported the jury's finding on the knowledge element of Count 97.

## VI.  WHETHER THE INSTRUCTION ON COUNTS 95-97 WAS ERRONEOUS

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, Kelly seeks a new trial on Counts 95 through 97. Specifically, he argues that the Court's instruction on those counts was erroneous because it did not include a <u>mens rea</u> requirement as to one element.  Counts 95-97 charged violations of 18 U.S.C. § 922(b)(3), which forbids the sale or delivery of any firearm "to any person who the licensee knows or has reasonable cause to believe does not reside in . . . the State in which the licensee's place of business is located . . . ."  The last (and unnumbered) paragraph of § 922(b) states: "Paragraphs (1), (2), (3), and (4) of this subsection shall not apply to transactions between licensed importers, licensed manufacturers, licensed dealers, and licensed collectors."

The Court's instruction as to Counts 95-97 read as follows:

[T]he Government must prove each of the following elements beyond a reasonable doubt:

**FIRST:**    The defendant was licensed as a Federal firearms manufacturer or dealer;

**SECOND:**   At the times and places charged in the Indictment, the defendant knowingly and willfully sold or delivered firearms to persons who the defendant knew, or had reasonable cause to believe, did not reside in West Virginia.

- The defendant in this case is licensed by the government as a federal firearms licensee to engage in the business of dealing in certain firearms that do not include machineguns. As such, the defendant can generally be expected to be familiar with the specific provisions of law that govern the firearms business.

**THIRD:**    That the person to whom the firearm was transferred was not a licensed importer, a licensed manufacturer, a licensed dealer, or a licensed collector.

Under 18 U.S.C. § 924(a)(1)(D), "whoever . . . willfully violates any . . . provision of this chapter [including § 922(b)], shall be fined under this title, imprisoned not more than five years or both."    Kelly thus argues that the third element of the Court's instruction should have required willfulness.    The third element, however, reflects an exception for those who otherwise knowingly and willfully violate § 922(b); it does not proscribe any conduct.    Moreover, § 922(b) explicitly imposes a <u>mens rea</u>

## MEMORANDUM OPINION & ORDER

requirement for the unlawful transfer of firearms, but not with respect to the licensee status of the recipient. Therefore, the addition of a willfulness requirement to the statutory exception in § 922(b) would contradict the plain meaning of the statute. Cf. United States v. Sun, 278 F.3d 302, 312 (4th Cir. 2002) (construing an "exception" to a criminal law as an affirmative defense, as opposed to an element of the offense).

Kelly cites no case law adopting his interpretation of § 922(b). Moreover, the Court's instructions as to Counts 95-97 comport with the model jury instructions of the Ninth Circuit and analogous instructions used by the Eleventh Circuit. See Ninth Circuit Manual of Model Jury Instructions, Criminal, § 8.53 (2000); Eleventh Circuit Pattern Jury Instructions, Criminal, § 34.5 (2003) (instructions for § 922(d)(1), which has a virtually identical licensee exception and statutory structure); see also United States v. Peters, 403 F.3d 1263, 1268 (11th Cir. 2005) (enumerating the elements for violation of § 922(d)(1) without including the statutory exception for licensees). Therefore, the Court is satisfied that its challenged instructions correctly stated the applicable law.

## VII. WHETHER THE ADMISSION OF TESTIMONY CONCERNING THE MARKINGS ON THE FAL RIFLE (COUNT 205) REQUIRE A NEW TRIAL

According to Kelly, an ATF Inspector[4] testified that, concerning the FAL rifle (Count 205), federal regulations required that a rifle manufactured by a licensed manufacturer for sale to a law enforcement agency be marked "Restricted Law Enforcement/Government Use Only" at the time of manufacture and that, to be "stockpiled," such a rifle must be so marked. Kelly maintains that the regulations do not specify a particular time when the necessary markings must be placed on the firearms. Thus, he argues that the jury was misinformed about the requirements for Kelly's possession of the FAL, which, in the interest of justice, entitles him to a new trial as to Count 205.

Under Rule 33(a) of the Federal Rules of Criminal Procedure, a district court "may vacate any judgment and grant a new trial if the interest of justice so requires." The admission of prejudicial evidence presumptively entitles a defendant to a new trial unless the Government proves that the admission was harmless. United States v. Lentz, 383 F.3d 191, 219 (4th Cir. 2004) (quoting United States v. Barnes, 747 F.2d 246, 250 (4th Cir. 1984)). "In determining whether evidence is prejudicial, 'the general standard . . . is whether there is a reasonable possibility that the jury's

---

[4] Neither party identified the name of this witness.

verdict was influenced by the material that improperly came before it.'" Id. (quoting Barnes, 747 F.2d at 250).

To determine the necessity of a new trial, the Court must first evaluate whether the challenged testimony was prejudicial. Kelly asserts that the ATF inspector's testimony regarding the regulatory requirements for marking semiautomatic assault weapons for law enforcement sales "misinformed" the jury "about the requirements for Kelly's possession." Assuming this is correct, Kelly's argument nevertheless fails to demonstrate how such testimony could have improperly influenced the jury.

In the "Essential Elements of Specific Charges" portion of the jury instructions as to Count 205, the Court provided the following instruction, in relevant part:

**FIRST:**     **The defendant must knowingly possess the firearms described in the indictment.**

.  .  .  .

**SECOND:**    **The firearms possessed by the defendant were semiautomatic assault weapons.**

.  .  .  .

**THIRD:**     **The defendant must know the firearms possessed the features that brought the firearms within the scope of Section 922(v).**

If you find that the Government has proven beyond a reasonable doubt that defendant knew these semiautomatic rifles possessed the ability to accept a detachable magazine and at least two of the features of a semiautomatic assault rifle, then you may conclude that

-23-

defendant knew the firearms were semiautomatic assault
weapons.
    On the other hand, if you find that the Government
has failed to prove, beyond a reasonable doubt, any one
(or more) of the three (3) elements of the offense, or if
you find that the defendant's possession or transfer of
the semiautomatic weapon was legal, you must find the
defendant not guilty of Count 205.

Earlier in its charge, the Court had noted that the
prohibition on possessing semiautomatic assault weapons does not
apply "to the manufacture for or transfer to a **department, agency,
or political subdivision of a State or law enforcement officer
employed by such an entity, so long as the defendant complied with
administrative regulations of the ATF relating to the manufacture
of a semiautomatic assault weapon for purposes of transfer to such
entities or law enforcement officers."** As to the FAL, the relevant
administrative regulation is 27 C.F.R. § 478.92 (2003), which
requires licensed manufacturers and importers to conspicuously mark
"RESTRICTED LAW ENFORCEMENT/GOVERNMENT USE ONLY" on semiautomatic
assault weapons manufactured after September 13, 1994.

Substantial evidence supported the jury's finding that Kelly
knowingly and unlawfully possessed the FAL rifle in Count 205, a
banned semi-automatic assault weapon. It is undisputed that, at
the time of seizure, the FAL was not properly marked and was fully
manufactured. The Government offered evidence at trial
establishing that Kelly possessed and transferred another FAL

(serial no. 200036) and that, at the time of its transfer, that firearm was not marked as required under the regulations. Moreover, the FAL in Count 205 was not recorded either in Kelly's bound book or his personal collection records.

Finally, Kelly fails to establish that the ATF inspector's testimony was improperly admitted. As an initial matter, the testimony offered a reasonable interpretation of a vague administrative regulation and was not, as Kelly insists, "erroneous as a matter of law." Kelly otherwise does not indicate whether he preserved an objection to the disputed testimony, which has not been transcribed for the Court to review. In any event, he had ample opportunity to seek a limiting instruction regarding the testimony and to address this issue in his closing arguments.[5]

Furthermore, in its preliminary instructions, the Court emphasized that "the law as given to you by the Court in these and other instructions constitutes the only law for your guidance, and it is your duty to accept and follow the law given to you by the Court's instructions, even though you may disagree with the law or

---

[5] Based on the Court's recollection, Kelly's closing argument on this issue focused on whether the FAL was manufactured for law enforcement. Notably, Kelly failed to propose any limiting instructions with respect to the inspector's testimony.

**MEMORANDUM OPINION & ORDER**

believe that the law should be otherwise."[6]    (emphasis added).

Thus, the jury should have disregarded any testimony interpreting

a federal regulation that was not confirmed in the Court's

instructions.    Based on this record, and in light of the jury's

independent finding that Kelly unlawfully possessed a Maadi semi-

automatic assault weapon under Count 205, no new trial is warranted

for that count of conviction.

### VIII.  MOTION FOR RECONSIDERATION

By an Order entered on January 4, 2005, the Court denied

Kelly's motion to recover his attorney's fees and litigation

expenses pursuant to the Hyde Amendment, 18 U.S.C. § 3006A, with

respect to Counts 1-84 and 127-204 of his second superceding

indictment.  On March 30, 2005, Kelly moved the Court to reconsider

this ruling.    The Court finds that the latter motion merely

disputes the admissible conclusions of a recognized expert, i.e.,

Officer Vasquez, and thus fails to establish that the Government's

prosecution on the relevant counts was frivolous.       In re 1997

Grand Jury, 215 F.3d 430, 437 (4th Cir. 2000).    Accordingly, the

Court **DENIES** the motion for reconsideration.

---

[6] Per the Court's usual practice, each juror received a copy of
the charge prior to closing arguments and kept the charge throughout
jury deliberations.  Therefore, there can be no genuine assertion that
the jurors were unaware of the law on this (or other) issues.

### IX.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Kelly's motion for acquittal as to Count 99 and thus **DISMISSES** that count.   The Court **DENIES** Kelly's remaining post-trial motions (dkt. no. 86, 110).

The Clerk is directed to transmit copies of this Order to counsel of record, the defendant, and all appropriate agencies.

DATED: July _____*12*_____, 2005.

_____
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE